UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

_____

JAMES PAUL ZACHARKO II,

                    Petitioner,                    Case No. 1:17-cv-501

v.                                      Honorable Gordon J. Quist

SHIRLEE HARRY,

                    Respondent.

_____/

## REPORT AND RECOMMENDATION

       This is a habeas corpus action brought by a state prisoner under 28 U.S.C. § 2254. Petitioner James Paul Zacharko, II, is incarcerated with the Michigan Department of Corrections at the Carson City Correctional Facility (DRF) in Carson City, Michigan.  On April 10, 2014, a St. Joseph County Circuit Court jury found Petitioner guilty of 16 counts of third-degree criminal sexual conduct, MICH. COMP. LAWS § 750.520d(1)(a).   On May 9, 2014, the court imposed sentences of 10 to 15 years on each count, all to be served concurrently.

       On June 2, 2017, Petitioner filed his habeas corpus petition raising five grounds for relief, paraphrased as follows:

I.      Trial court improperly limited the testimony of defense expert Dr. Okla.

II.     Prosecution expert Dr. Henry was allowed to give improper testimony, defense counsel acted ineffectively.

III.    Due process was violated where the verdict form did not identify specific occurrences with which Petitioner was being charged, lack of unanimous verdict, and ineffective assistance of counsel.

IV.    Ineffective assistance of counsel regarding fingerprint evidence.

     V.     Improper character evidence presented of Petitioner's drug use and past criminal record, ineffective assistance of counsel.

(Pet., ECF No. 1-8, PageID.145-150.)  Respondent has filed an answer to the petition (ECF No. 7) stating that the grounds should be denied because they are meritless.  Upon review and applying the standards of the Antiterrorism and Effective Death Penalty Act of 1996, Pub. L. 104-132, 110 Stat. 1214 (AEDPA), I find that the grounds are meritless.  Accordingly, I recommend that the petition be denied.

## Discussion

     I.     Factual Allegations

Petitioner's jury heard testimony on April 8, 9, and 10, 2014, which included testimony from the victim.  The victim testified that, at the age of 14, during the summer of 2012, she fell in love with Petitioner and participated in a consensual sexual relationship with him.  (Trial Tr. II, ECF No. 8-12, PageID.700-728, 734-758, 773.)  She got to know Petitioner because he had dated her mother.  (*Id.*, PageID.695.)  The victim testified that the sexual relationship began during encounters in nearby counties--those initial penetrations, however, were not the subject of the St. Joseph County prosecution.  (*Id.*, PageID.699-702, 711-714.)  Eventually, according to the victim, Petitioner would swing by her home in St. Joseph County, when her mother was sleeping or working, she would sneak outside, and Petitioner would penetrate her vaginally and orally with his penis.  (*Id.*, PageID.704-710, 714-728, 863-865.)  The victim indicated she was in love with Petitioner.  (*Id.*, PageID.745-746.)

The victim and Petitioner communicated regularly by text.  The prosecution introduced several texts into evidence.  (*Id.*, PageID.738-758.)  The texts did not expressly

reference the sexual relationship; however, they revealed a relationship between Petitioner and the victim that was plainly inappropriate in light of her age. (*Id*.) The victim indicated there were many, many more texts that she had deleted. (*Id*., PageID.760-761.)

The victim's mother, Cheri, testified regarding the texts. She indicated that she discovered some of the texts near the end of the summer. (Trial Tr. I, ECF No. 8-10, PageID.459.) She responded, using the victim's phone, directing Petitioner to stop communicating with her daughter. (*Id*.) Cheri put a block on texting from the victim's telephone. (*Id*., PageID.473-474.) The texts continued nonetheless; the victim used an app to overcome the block. (*Id*.) When Cheri discovered texts the second time, at the beginning of September, she informed Petitioner she would contact the police. (*Id*., PageID.459-460.) She followed through on that threat. (*Id*.)

Petitioner responded to the threat with a lengthy email that Cheri read for the jury. (*Id*., PageID.463-471.) In the email, Petitioner acknowledged that he and the daughter had engaged in lots of texting and talking, but Petitioner denied that he had ever touched her. (*Id*.)

The texting continued. Petitioner supplied the victim with a prepaid telephone. (Trial Tr. II, ECF No. 8-12, PageID.728-729.) When it broke, he arranged to drop off another telephone outside her home. (Trial Tr. I, ECF No. 8-10, PageID.474-475.) At the time of the proposed drop-off, however, the victim had informed Cheri regarding the prepaid telephones. (*Id*.) Cheri intercepted the prepaid telephone that had been dropped-off in a plastic bag near her mailbox. (*Id*., PageID.475-477.) She turned it over to the police. (*Id*., PageID.552.)

Later in September, the victim told Cheri about the sexual nature of the relationship. (*Id*., PageID.509.) This was not the first time the issue had come up. The victim had hinted to her aunt earlier in the summer that she might have been having a sexual relationship with an older

3

man.  (Trial Tr. II, ECF No. 8-12, PageID.774.)  The aunt told Cheri, and the two of them confronted the victim.  (Trial Tr. I, ECF No. 8-10, PageID.517-518.)  At that time she denied it. (*Id.*)  Late September was the first time she acknowledged the sexual relationship to Cheri.  (*Id.*, PageID.509.)  Cheri brought her in to the police where Officer Bingaman interviewed the victim and her mother.  (*Id.*, PageID.544-545.)

In addition to the mother, the victim, and the police officer, the jury also heard testimony from an expert for the prosecution, Dr. Henry, and an expert for the defense, Dr. Okla. The permitted scope of the expert testimony was the subject of much discussion before and during the trial.  The trial court interpreted a stipulation between the parties to foreclose Dr. Okla's testimony on the subjects of forensic interviewing protocols and suggestibility.  Essentially, Dr. Henry testified that it is typical for a child who has been sexually abused to delay disclosure of the abuse, deny that the abuse occurred, and then disclose the abuse bit by bit.  (*Id.*, PageID.528-529, 536-539.)  Dr. Okla, on the other hand, testified that it would not be typical for a sexually abused individual to deny the abuse in response to a direct question and then later disclose.  (Trial Tr. II, ECF No. 8-12, PageID.914-916, 920-925.)  Dr. Okla also testified that is important to rule out other possible explanations for the disclosure.  (*Id.*, PageID.925-931.)

The precise number of incidents of penetration identified by the victim changed from her initial disclosure to the trial testimony.  Based on the trial testimony, the prosecutor amended the information to identify 11 penile/vaginal penetrations and 12 penile/oral penetrations. The prosecutor tied the specific counts to the incidents as described by the victim: 8 times where the victim snuck out of the house and Petitioner penetrated her vagina and her mouth with his penis while they were in the field across the street from the home; 1 time when Petitioner penetrated the

4

victim's vagina and her mouth with his penis while they were in the front yard of the home; 2 times, on the same day, when Petitioner penetrated the victim's vagina and her mouth with his penis while they were in the home; and 1 time when Petitioner penetrated the victim's mouth with his penis while they were in his car.  (Trial Tr. III, ECF No. 8-13, PageID.945, 968-969, 986-988.)

The court prepared a verdict form that required the jurors to reach a unanimous verdict as to each instance of penetration, but it did not tie the numbered counts on the information or the verdict form to the specific allegations of the victim, i.e., Count 1-the first penile vaginal penetration in the field or Count 23-the penile oral penetration in the vehicle.  Critically, the jury did not convict on all 23 counts.  (*Id*., PageID.965-966; Pet. Exh. 3, ECF No. 1-4.)  They completed the form in its entirety, but they unanimously found Petitioner guilty on the first eight of the eleven vaginal penetrations and the first eight of the twelve oral penetrations.  (Pet. Exh. 3, ECF No. 1-4.) They unanimously found Petitioner not guilty of the last three of the eleven vaginal penetrations and the last four of the twelve oral penetrations.  (*Id*.)  It is impossible to tell from the form which penetrations the prosecutor failed to prove.  But the trial court clearly instructed the jurors that they had to be unanimous with respect to each instance of penetration:

You're going to get one of these verdict forms that the foreperson will be responsible for.  You have [to] reach a unanimous verdict on each count, so you have to go count by count, and when you have a unanimous verdict you can check the box.

You have to be in agreement not only with the elements, but also that you're talking about the same occurrence.  So one can't be thinking of one time and one can't be thinking of another.  You all have to be talking about the same incident and then be unanimous in your decision on that as to guilt or not guilty. Do you all understand that? Okay.

5

(Trial Tr. III, ECF No. 8-13, PageID.1043.)  The jurors worked through the 23-count form in about two hours.  (*Id*., PageID.1048.)

Petitioner directly appealed his convictions.  He also filed a motion for new trial in the trial court based on the trial court's restriction of Dr. Okla's testimony and trial counsel's ineffective assistance.  The motion essentially raised the issues presented in this petition.

The trial court conducted an evidentiary hearing on March 9, 2015.  (*Ginther* Hr'g Tr., ECF No. 8-16.)  The trial court rendered its decision on May 26, 2015.  (Court's Decision Tr., ECF No. 8-17.)  With regard to the limitation on Dr. Okla's testimony, the court held firm on its conclusion that the parties had so limited the testimony by stipulation.  (*Id*., PageID.1292-1295.)  The trial court then considered whether it was ineffective assistance for Petitioner's counsel to so stipulate.  (*Id*., PageID.1295-1298.)  The trial court concluded it was not ineffective assistance because he would not have allowed the excluded expert testimony anyway.  (*Id*.)

The trial court determined that trial counsel's cross-examination of Dr. Henry was not so inadequate as to constitute ineffective assistance.  (*Id*., PageID.1298-1300.)  The trial court concluded that its clear instructions eliminated any problem with the verdict form.  (*Id*., PageID.1300-1301.)  The trial court determined that trial counsel's decision to forego testimony from the Michigan State Police lab technician regarding the fingerprint analysis of the prepaid phone bag was strategic.  (*Id*., PageID.1301-1302.)  Finally, the trial court concluded that the "prior bad acts" evidence was admissible for purposes other than showing propensity and that counsel's decision to not object and thereby avoid drawing attention was not unreasonable, particularly where the court instructed the jury regarding the limited permissible use of the evidence.  (*Id*., PageID.1302-1305.)

6

Petitioner, with the assistance of counsel, raised his five habeas issues in the Michigan Court of Appeals.  (Appellant's Br., ECF No. 8-19, PageID.1524-1525.)  The Michigan Court of Appeals denied relief in an unpublished opinion issued December 22, 2015.  (Mich. Ct. App. Op., ECF No. 8-18, PageID.1307-1318.)

Petitioner, again with the assistance of counsel, then filed an application for leave to appeal in the Michigan Supreme Court raising the same five issues.  (Appl. for Leave to Appeal, ECF No. 8-21, PageID.1737-1738.)  That court denied leave by order entered June 28, 2016.

On June 2, 2017, Petitioner timely filed the instant petition.

II.    AEDPA Standard

The AEDPA "prevents federal habeas 'retrials'" and ensures that state court convictions are given effect to the extent possible under the law.  *Bell v. Cone*, 535 U.S. 685, 693-94 (2002).  An application for writ of habeas corpus on behalf of a person who is incarcerated pursuant to a state conviction cannot be granted with respect to any claim that was adjudicated on the merits in state court unless the adjudication:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established federal law as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based upon an unreasonable determination of the facts in light of the evidence presented in the state court proceeding."   28 U.S.C. § 2254(d).  This standard is "intentionally difficult to meet."  *Woods v. Donald*, 575 U.S. __, 135 S. Ct. 1372, 1376 (2015) (internal quotation omitted).

The AEDPA limits the source of law to cases decided by the United States Supreme Court.  28 U.S.C. § 2254(d).  This Court may consider only the "clearly established" holdings, and not the dicta, of the Supreme Court.  *Williams v. Taylor*, 529 U.S. 362, 412 (2000); *Bailey v.*

*Mitchell*, 271 F.3d 652, 655 (6th Cir. 2001).  In determining whether federal law is clearly established, the Court may not consider the decisions of lower federal courts.  *Lopez v. Smith*, 135 S. Ct. 1, 3 (2014); *Bailey*, 271 F.3d at 655.  Moreover, "clearly established Federal law" does not include decisions of the Supreme Court announced after the last adjudication of the merits in state court.  *Greene v. Fisher*, 565 U.S. 34 (2011).  Thus, the inquiry is limited to an examination of the legal landscape as it would have appeared to the Michigan state courts in light of Supreme Court precedent at the time of the state-court adjudication on the merits.  *Miller v. Stovall*, 742 F.3d 642, 644 (6th Cir. 2014) (citing *Greene*, 565 U.S. at 38).

A federal habeas court may issue the writ under the "contrary to" clause if the state court applies a rule different from the governing law set forth in the Supreme Court's cases, or if it decides a case differently than the Supreme Court has done on a set of materially indistinguishable facts.  *Bell*, 535 U.S. at 694 (citing *Williams*, 529 U.S. at 405-06).  "To satisfy this high bar, a habeas petitioner is required to 'show that the state court's ruling on the claim being presented in federal court was so lacking in justification that there was an error well understood and comprehended in existing law beyond any possibility for fairminded disagreement.'" *Woods*, 135 S. Ct. at 1376 (quoting *Harrington v. Richter*, 562 U.S. 86, 103 (2011)).  In other words, "[w]here the precise contours of the right remain unclear, state courts enjoy broad discretion in their adjudication of a prisoner's claims."  *White v. Woodall*, 572 U.S. ___, 134 S. Ct. 1697, 1705 (2014) (internal quotations omitted).

The AEDPA requires heightened respect for state factual findings.  *Herbert v. Billy*, 160 F.3d 1131, 1134 (6th Cir. 1998).  A determination of a factual issue made by a state court is presumed to be correct, and the petitioner has the burden of rebutting the presumption by clear and

8

convincing evidence.  28 U.S.C. § 2254(e)(1); *Lancaster v. Adams*, 324 F.3d 423, 429 (6th Cir. 2003); *Bailey*, 271 F.3d at 656.  This presumption of correctness is accorded to findings of state appellate courts, as well as the trial court.  *See Sumner v. Mata*, 449 U.S. 539, 546 (1981); *Smith v. Jago*, 888 F.2d 399, 407 n.4 (6th Cir. 1989).

III.    The Defense Expert

On direct appeal, Petitioner made significant progress on his claim that the trial court improperly excluded portions of Dr. Okla's testimony.  The court of appeals agreed with Petitioner that the trial court improperly interpreted the stipulation between the parties regarding Dr. Okla's testimony.  (Mich. Ct. App. Op., ECF No. 8-18, PageID.1308-1309.)  The court of appeals concluded "upon careful scrutiny of the record, the only evident stipulation was an agreement by defense counsel to limit Okla's testimony in accordance with the parameters of the law applicable to experts testifying in sexual abuse cases involving child victims."  (*Id.*)  The court of appeals found that stipulation to be "unremarkable."  (*Id.*, PageID.1309.)  The appellate court specifically found "no record support for an agreement or stipulation by defense counsel that Okla's testimony was to be limited to the subject of behaviors and characteristics of sexually abused children."  (*Id.*)

The Michigan Court of Appeals then went on to tackle the trial court's conclusion that Okla's testimony would not have been admissible even absent the stipulation.  Again, the court of appeals concluded the trial court was wrong.  (*Id.*, PageID.1309-1310.)  The court determined the exclusion was erroneous as a matter of state law.  The appellate court implicitly rejected, but never expressly considered, the constitutional aspect of Petitioner's claims.

9

Even where the state court does not provide an articulated analysis of the constitutional issue, the Sixth Circuit calls for the application of AEDPA deference; the deference, however, is to the result reached, not the reasoning used. *Hawkins v. Coyle*, 547 F.3d 540, 546-547 (6th Cir. 2008). Thus, this Court must consider whether the state appellate court's result is contrary to clearly established federal law.

Despite finding error under state law, the court of appeals denied Petitioner relief. The court concluded the errors had no impact on the jury's verdict:

> Despite the trial court's error in limiting Okla's testimony, reversal of defendant's convictions is not warranted, given that we cannot conclude that the error affected the outcome of the proceedings. "No . . . verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of . . . improper . . . rejection of evidence, . . . unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."  MCL 769.26; see also *People v Lukity*, 460 Mich 484, 495; 596 NW2d 607 (1999) (Under MCL 769.26, the effect of an error is evaluated by assessing it in the context of the untainted evidence in order to determine whether it is more probable than not that a different outcome would have resulted absent the error.).

> Okla was able to give some testimony that supported defendant's theory of the case, addressing factual circumstances supported by evidence in the record, but framed as hypotheticals, and that could reasonably be viewed as undermining the victim's credibility or the accuracy of her allegations.  Okla testified that it was uncommon for complainants to deny sexual abuse allegations when specifically asked by others, noting that a "large majority of children, when they are asked, . . . do give a complete disclosure."  She also indicated that a high percentage of children who disclose sexual abuse do not later recant the allegations.  Okla next testified that when there is a very short period of time between an initial communication by an alleged perpetrator to a victim and an act of sex between the two, it is not suggestive of grooming.  She further stated that self-harm was not necessarily reflective of abuse and that it was healthy and appropriate for teenagers to distance themselves from their parents, as opposed to being indicative of sexual abuse.  Okla additionally testified that when a complainant keeps varying the number of sexual acts that purportedly occurred in discussions with others or in testimony, "it would . . . raise questions about was there any motivation to distort or mischaracterize or even intentionally deceive."  When asked whether she would

10

be concerned by the fact that a complainant had been questioned by several people about allegations of sexual abuse prior to a police interview, Okla responded, "that's a huge indication of taint or suggestibility."  Defense counsel then asked Okla to explain that conclusion, and she testified, absent objection, as follows:

> In general, if you ask a person questions[,] you are introducing notions or concepts, you're asking them to focus on a particular area or event or detail. You're [sic] emotional reaction, your facial expression, asking a person to even imagine doing some action causes your brain to fire in a particular way that makes it seem familiar.

> So you – you can add confidence, you can add details, you can change the memory – and we do this, all of us do this – you – you construct memories that become in your own mind more coherent and more consistent with what you think other people want to or believe happened.

Okla next testified as follows, after defense counsel asked her about research on false allegations of sexual abuse:

> Like a . . . fake memory, a not . . . accurate memory that have been either induced in an experiment or just by interviewing kids after events that show that kids do sometimes make wrong, inaccurate statements because they believe what they're saying, and other times that they have made statements that they know factually are not true for various different reasons that are, for example, outlined in the American Professional Society on the Abuse of Children, where they talk about [how] investigators need to be very careful to consider all these possible motivations for kids to say things that are not true . . . .

> In order to have a good investigation, whether you want to call it a "forensic interview" or not, you have to keep in mind all the possibilities for why a child might come to say what they're saying, and that does sometimes include deliberate deceit, but sometimes it's mistaken.

Defense counsel next broached the subject of environmental factors that can influence disclosures of sexual abuse, and Okla testified:

> It's an alternative explanation or an alternative hypothesis to take into account and to try and rule out as an explanation for the motives of making a disclosure, which might be, "I want to get out of trouble," "I don't want to have this person in my life anymore," "I need to explain my bad grades."

11

There are all kinds of reasons that are widely published as possible reasons to explore as underlying motivations in making disclosures.

It doesn't necessarily prove that it's not . . . true or false, but there are things that can affect or influence, as you said, the timing and the nature of the disclosure.

Shortly after this testimony, the trial court itself asked Okla for clarification with respect to environmental factors influencing the disclosure of sexual abuse, and Okla testified that environmental factors can be "significant enough that we try in the protocols . . . to make sure to look into" such factors in order to rule them out.

As reflected in Okla's testimony, although the trial court had ruled to limit her testimony to the area of behaviors and characteristics of sexually abused children, there can be no dispute that her actual testimony wandered beyond that restriction at numerous points, touching on some of the very subjects that defendant wished to present to the jury. We recognize that Okla would have been able to testify in much greater detail on the banned areas of expertise without the court's ruling, but we cannot conclude that defendant has established the requisite prejudice to warrant reversal. This is especially true where, in conjunction with consideration of the testimony that Okla was allowed to give at trial, the victim was 14 years old when the events transpired and when she spoke to the investigating officer, not a younger child more easily susceptible to improper questioning or influence, thereby lessening the danger of taint. And further, this case did not involve one or just a few sexual acts; rather, defendant and the victim were involved in an ongoing sexual relationship, entailing a high number of sexual encounters. Moreover, the investigating officer's testimony, although brief, indicated that he had not used leading questions in interviewing the victim and that he had failed to elicit much in terms of details – there was not even a discussion of oral sex, which was the subject of 12 counts. Given all of this context, and despite being relevant, expert testimony on forensic interviewing protocols and suggestibility would have added very little to assessing the accuracy of the victim's claim that she had sex with defendant. Additionally, the untainted evidence of an improper relationship between defendant and the victim, evidenced primarily by text messages, was strong and corroborated much of the victim's testimony. In a telling text message from defendant to the victim, he stated, "I promise to see you as much as possible. We just need to be careful." Finally, defendant fully engaged in aggressive cross-examination of the victim in an effort to impeach her credibility, succeeding in part in light of the acquittals on seven counts. In sum, despite the trial court's errors, we decline to reverse the verdict on the basis that Okla's testimony was impermissibly limited, considering that defendant has not established a miscarriage

of justice, i.e., that it is more probable than not that he would have been acquitted on the charges but for the limitation placed on the scope of Okla's testimony.

(Mich. Ct. App. Op., ECF No. 8-18, PageID.1310-1313 (footnote omitted).)

The implicit rejection of Petitioner's due process claim is not contrary to clearly established federal law. The extraordinary remedy of habeas corpus lies only for a violation of the Constitution. 28 U.S.C. § 2254(a). As the Supreme Court explained in *Estelle v. McGuire*, 502 U.S. 62 (1991), an inquiry whether evidence was properly admitted or improperly excluded under state law "is no part of the federal court's habeas review of a state conviction [for] it is not the province of a federal habeas court to re-examine state-court determinations on state-law questions." *Id.* at 67-68. Rather, "[i]n conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States." *Id.* at 68. State-court evidentiary rulings cannot rise to the level of due process violations unless they offend some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental. *Seymour v. Walker*, 224 F.3d 542, 552 (6th Cir. 2000) (quotation omitted); *accord Coleman v. Mitchell*, 268 F.3d 417, 439 (6th Cir. 2001); *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). This approach accords the state courts wide latitude in ruling on evidentiary matters. *Seymour*, 224 F.3d at 552 (6th Cir. 2000).

Further, under the AEDPA, the court may not grant relief if it would have decided the evidentiary question differently. The court may only grant relief if Petitioner is able to show that the state court's evidentiary ruling was in conflict with a decision reached by the Supreme Court on a question of law or if the state court decided the evidentiary issue differently than the

Supreme Court did on a set of materially indistinguishable facts. *Sanders v. Freeman*, 221 F.3d 846, 860 (6th Cir. 2000). Petitioner has not met this difficult standard.

The closest Petitioner comes to identifying a fundamental principle of justice offended by the state court's exclusion of the expert testimony is his claim that the court prevented him from presenting a defense. Petitioner is hard-pressed to identify any clearly established federal law to support that theory. He has not cited any Supreme Court authority to support his claim that the exclusion of Dr. Okla's testimony regarding forensic interviews or suggestibility rises to the level of a due process violation because it prevented Petitioner from raising a defense.

There is a recognized difference between failure to present a defense and failure to present testimony from an expert witness in support of a defense; criminal defendants have often been barred from presenting expert testimony that supports a particular defense. *See, e.g., Moore v. Tate*, 882 F.2d 1107, 1110-1111 (6th Cir. 1989) (exclusion of expert witness regarding eyewitness identification not constitutionally infirm where counsel was able to cross-examine eyewitness); *Dorch v. Smith*, 105 F. App'x 650, 653 (6th Cir. 2004) (court held absence of identification expert not prejudicial where counsel was able to cross-examine identifying witness and presented alibi witnesses); *Moreland v. Bradshaw*, 699 F.3d 908 (6th Cir. 2012) (court permitted to exclude a portion of expert child psychologist's testimony regarding suggestibility of "parentified" child); *Tourlakis v. Morris*, 738 F. Supp. 1128 (S.D. Ohio 1990) (state may constitutionally exclude testimony of expert regarding battered wife syndrome in support of self-defense claim); *Mitchell v. Renico*, No. 1:05-cv-47, 2006 WL 1521752, *1-2 (W.D. Mich. May 31, 2006) (court permitted to exclude expert psychiatric testimony regarding closeness of

14

relationship between defendant and his brother where defendant's defense was action in defense of another and others testified regarding nature of the relationship).

Petitioner was not foreclosed from challenging the victim's credibility.  Counsel subjected her to extensive cross-examination which highlighted how the victim's response differed from Dr. Okla's description of a typical victim's response.  The cross-examination also explored other possible motivations for the victim's accusations against Petitioner.  Petitioner's counsel also reviewed with the victim how her descriptions of the number, nature, and location of the sexual encounters had changed over time.

Moreover, it was not the prosecutor who introduced the victim's statements from the interview—an interview which Petitioner contends was conducted inappropriately—the defense did.  He used the victim's statements from the interview to show that the victim's description of the number, nature, and location of the sexual encounters changed over time.  Her statements to the interviewer were offered as one of her inconsistent accounts.  Petitioner explained to the jury that the victim identified only a certain number of incidents and never even mentioned penile/oral penetrations or a sexual encounter in the car as part of the interview.

Petitioner was precluded from exploring how the interview failed to comply with forensic interviewing protocols, but Petitioner's counsel had every opportunity to test the victim's testimony in the same way a forensic interview would have.  There is no record support for Petitioner's claim that the trial court's exclusion of a portion of Dr. Okla's testimony denied Petitioner the ability to present a defense.

Even if the trial court violated due process by limiting Dr. Okla's testimony, the error was harmless.  The Michigan Court of Appeals, having identified a state-law error by virtue

15

of the limitation on Dr. Okla's testimony, applied a state statutory standard to determine if the error warranted reversal.  Michigan Compiled Laws § 769.26 states that an improper rejection of evidence warrants reversal only if "the error complained of has resulted in a miscarriage of justice." Mich. Comp. Laws § 769.26.  Under Michigan law, justice is miscarried where "it is more probable than not that a different outcome would have resulted absent the error."  (Mich. Ct. App. Op., ECF No. 8-18, PageID.1310) citing *People v. Lukity*, 596 N.W.2d 607 (Mich. 1999).  The court of appeals concluded that Petitioner failed to meet that standard.

The "more probable than not" standard employed by the Michigan Court of Appeals is similar, but not identical, to the harmless error standard under *Brecht v. Abrahamson*, 507 U.S. 619 (1993).[1]  The *Brecht* standard requires the Court to consider whether the constitutional error in the state criminal trial had a "substantial and injurious effect" on the result. *Brecht*, 507 U.S. at 638.  In determining whether the restriction was harmless, a court must consider a number of factors, "'includ[ing] the importance of the witness' testimony in the prosecution's case, whether the testimony was cumulative, the presence or absence of evidence corroborating or contradicting the testimony of the witness on material points, the extent of cross-examination otherwise permitted, and, of course, the overall strength of the prosecution's case.'" *Hargrave v. McKee,* 248 F. App'x 718, 728 (6th Cir. 2007) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 684 (1986)).

---

[1] In *United States v. Dominguez Benitez*, 542 U.S. 74 (2004), in a concurring opinion, Justice Scalia decried the difficulty in distinguishing between "no fewer than four assertedly different standards of probability relating to the assessment of whether the outcome of trial *would* have been different *if* error had not occurred, or *if* omitted evidence had been included." *Id.* at 86 (emphasis in original).  Justice Scalia considered "[s]uch ineffable gradations of probability . . . [to be] harmful rather than helpful to the consistency and rationality of judicial decisionmaking." *Id.* at 86-87.

Although the state appellate court applied a slightly different standard, its analysis is persuasive. Its findings regarding the impact of the exclusion, as detailed in the quote above, are eminently reasonable on this record. Petitioner was permitted to explore nearly the entire anticipated scope of Dr. Okla's testimony at trial. The absence of that portion of the testimony that was excluded, considered in light of the *Van Arsdall* factors, did not have a substantial and injurious effect on the verdict. Indeed, the most significant change in the victim's statement at the interview, as compared to the prior statements to her mother, was the jump in the number of sexual encounters from 8 to 11. It is likely no coincidence that the jury found Petitioner guilty of 8 instances of penile/vaginal penetration and 8 instances of penile/oral penetration, rather than 11 (or 12 with respect to penile/oral penetrations) as urged by the prosecutor.

Petitioner has failed to demonstrate that the Michigan Court of Appeals' result is contrary to clearly established federal law and he has failed to show that the court's factual findings are unreasonable on this record. Moreover, even if the limitation on Dr. Okla's testimony rises to the level of a due process violation, the violation is harmless under *Brecht*. Petitioner is not entitled to habeas relief because of the limits placed on Dr. Okla's testimony.

IV.    The Prosecution Expert

Petitioner next contends that: (1) the trial court erroneously admitted the expert testimony of Dr. James Henry; and (2) Petitioner's trial counsel was ineffective for (a) failing to challenge Dr. Henry on cross-examination, (b) failing to challenge the admission of Dr. Henry's testimony because it violated the Michigan Court Rules, and (c) failing to challenge the admission of Dr. Henry's testimony because it violated the Michigan Rules of Evidence.

17

In *Strickland v. Washington*, 466 U.S. 668, 687-88 (1984), the Supreme Court established a two-prong test by which to evaluate claims of ineffective assistance of counsel.  To establish a claim of ineffective assistance of counsel, the petitioner must prove:  (1) that counsel's performance fell below an objective standard of reasonableness; and (2) that counsel's deficient performance prejudiced the defendant resulting in an unreliable or fundamentally unfair outcome. A court considering a claim of ineffective assistance must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance."  *Id.* at 689.

Moreover, as the Supreme Court repeatedly has recognized, when a federal court reviews a state court's application of *Strickland* under § 2254(d), the deferential standard of *Strickland* is "doubly" deferential.  *Harrington*, 562 U.S. at 105 (citing *Knowles v. Mirzayance*, 556 U.S. 111, 123 (2009)); *see also Burt v. Titlow*, 134 S. Ct. 10, 13 (2013); *Cullen v. Pinholster*, 131 S. Ct. 1388, 1403 (2011); *Premo v. Moore*, 562 U.S. 115, 122 (2011).  In those circumstances, the question before the habeas court is "whether there is any reasonable argument that counsel satisfied *Strickland*'s deferential standard."  *Id.*; *Jackson v. Houk*, 687 F.3d 723, 740-41 (6th Cir. 2012) (stating that the "Supreme Court has recently again underlined the difficulty of prevailing on a *Strickland* claim in the context of habeas and AEDPA . . . .") (citing *Harrington*, 562 U.S. at 102).

The Michigan Court of Appeals resolved these challenges to counsel's effective assistance against the following standard:

Whether a defendant received the effective assistance of counsel is a mixed question of fact and law that we review, respectively, for clear error and de novo. *People v Ackley*, 497 Mich 381, 388; [870] NW2d [858] (2015).  "To obtain relief for the denial of the effective assistance of counsel, the defendant must show that counsel's performance fell short of . . . [an] objective standard of reasonableness

18

and that, but for counsel's deficient performance, there is a reasonable probability that the outcome . . . would have been different." *Id.* at 389 (citations and quotation marks omitted). A defendant must overcome the strong presumption that counsel's performance constituted sound trial strategy, but an appellate court is not permitted to insulate the review of counsel's performance by simply calling it trial strategy – the strategy must be sound, with decisions being objectively reasonable. *Id.* at 388-389. We must determine whether strategic choices were made after less than complete investigation or if a reasonable decision made an investigation unnecessary. *Id.* at 389.

(Mich. Ct. App. Op., ECF No. 8-18, PageID.1313-1314.) Although the court of appeals cited state authority, *Ackley*, that decision expressly relies on the *Strickland* standard. Accordingly, it cannot be said that the state court applied the wrong standard.

### A.      Inadequate cross-examination

Petitioner's trial counsel's cross-examination of the prosecution's expert was extremely short:

Q:      Doctor Henry, did you review any materials specific to this case?

A:      No, I did not.

(Trial Tr. II, ECF No. 8-10, PageID.540.) Then, after the trial court posed questions from the jurors, Petitioner's counsel cross-examined Dr. Henry again:

Q:      Have you talked to the complainant in this case at all?

A:      No.

Q:      Have you ever met her?

A:      No.

(*Id.*, PageID.542.)

At the *Ginther* hearing, Petitioner's trial counsel explained his reasons for the curt cross-examinations of Dr. Henry:

19

A:      [W]e did some exhaustive research on Dr. Henry.  We read some transcripts from him.  I drove down here and spoke with a couple of defense counsel that had tangled with him in the past.  And it was the—It was the opinion of the local counsel that this guy's smooth.  He gets on the stand, he's very smooth.  We don't usually engage him.  If we bring in an expert, that's what we do.  So our—our defense, so to speak, against Dr. Henry was to bring Okla on the stand and have a battle of the experts and let the jury sort it out . . . .

*     *     *

Q:      Now, during trial, Dr. Henry testified about his own study that he claims he conducted.  Do you have memory of that?

A:      I recall it.

Q:      Okay.  On that study—We can agree you did not cross-examine him about it?

A:      I did not.

Q:      Okay.  Why not?

A:      My—My thought process through this was exactly what I testified before.  We were going to put Okla on the stand.  I wasn't—I'm not an expert in psychology.  I don't claim to be.  I couldn't study from now until the end of the earth and probably have an appreciation for what Dr. Henry believes he knows or what Dr. Okla knows.

I'm not one of these guys that tangle with an expert.  I'm going to bring an expert in and let the expert explain our side of the case.  That was exactly the reason we did it.  I didn't want to tangle with Dr. Henry on areas that, quite frankly, I don't know anything about.

(*Ginther* Hr'g Tr., ECF No. 8-16, PageID.1250, 1252-1253.)

The trial court determined that defense counsel's decision to forego aggressive cross-examination of Dr. Henry was part of counsel's strategy.  (Court's Decision Tr., ECF No. 8-17, PageID.1298-1300.)  The Michigan Court of Appeals agreed: "defense counsel exercised a reasonable and sound trial strategy by not challenging Henry directly on cross-examination with

respect to the study and his opinions, instead choosing to counter Henry's testimony with Okla's testimony."  (Mich. Ct. App. Op., ECF No. 8-18, PageID.1314.)

That state appellate court's determination that counsel strategically chose to *not* aggressively cross-examine Dr. Henry is well supported by counsel's testimony at the *Ginther* hearing.  That finding is presumed to be correct and it is Petitioner's burden to overcome that presumption with clear and convincing evidence.  He has utterly failed to make that showing.

Here, counsel testified that he reviewed excerpts of Dr. Henry's prior expert testimony and explored Dr. Henry's performance as an expert with other defense counsel.  He concluded that Dr. Henry was sufficiently "smooth" that trying to do battle on cross-examination was less likely to yield a positive result than getting Petitioner's points across through Dr. Okla. Once counsel has explored an issue and made strategic choices, "the strategic choice made as a result 'will seldom if ever' be found wanting[, b]ecause advocacy is an art and not a science, and because the adversary system requires deference to counsel's informed decisions . . . ." *Strickland*, 466 U.S. at 681.

Petitioner has failed to establish that the state court's factual determinations regarding counsel's decision to limit cross-examination of Dr. Henry are unreasonable on this record or that its ultimate conclusions regarding counsel's effective assistance are contrary to, or an unreasonable application of, *Strickland*.  Therefore, he is not entitled to habeas relief on this issue.

### B.    Exclusion of Dr. Henry's testimony

Michigan Court Rule 6.201 provides that a party must, upon request, provide the other party with the curriculum vitae of an expert witness and "either a report by the expert or a

21

written description of the substance of the proposed testimony of the expert, the expert's opinion, and the underlying basis of that opinion[.]" Mich. Ct. R. 6.201(A)(3). The prosecutor provided Petitioner's counsel with Dr. Henry's curriculum vitae and transcript excerpts of Dr. Henry's testimony in prior cases. Petitioner claims the prosecutor did not provide a report, a written description of the substance of Dr. Henry's proposed testimony in Petitioner's case, Dr. Henry's opinion, or the underlying basis. For that reason, Petitioner argues, Dr. Henry's testimony should have been excluded and counsel should have objected to it.

The court of appeals was not convinced that counsel's performance fell short or that the testimony would be properly excluded:

> With respect to the arguments under MCR 6.201(A)(3), Henry gave fairly brief testimony regarding behaviors and characteristics of sexually abused children, opining on issues related to delayed disclosure, failure to disclose when first questioned by others, emotional connections between abusers and the abused, grooming, self-harm, traumatic memory, distancing from parents, and "testing" reactions through hints and incremental release of information about abuse. It is important to understand that, as repeatedly pointed out by the prosecutor during the proceedings, Henry had not been provided any information or documents concerning the facts specific to this case. Henry's testimony was extremely general in nature. It is entirely possible that the partial transcripts of Henry's testimony from other criminal cases that were provided to defense counsel covered the very same areas and revealed the very same opinions that Henry discussed in his testimony here, e.g., there is generally a delay by children in disclosing sexual abuse, which would explain why the transcripts were given to defense counsel. Those transcripts could certainly constitute a "written description" of the substance of Henry's proposed testimony, his opinions, and the underlying bases of those opinions in this case, satisfying MCR 6.201(A)(3). A "defendant has the burden of establishing the factual predicate for [a] claim of ineffective assistance of counsel[.]" *People v Hoag*, 460 Mich 1, 6; 594 NW2d 57 (1999). Defendant did not submit the transcript excerpts in relationship to the *Ginther* hearing, nor did defense counsel testify with respect to the content of those transcript passages. Accordingly, defendant has not satisfied his burden to establish the factual predicate of his ineffective assistance claim with respect to his arguments under MCR 6.201(A)(3). Moreover, defendant has failed to show that he was actually prejudiced by Henry's general and occasionally helpful testimony regarding

behaviors and characteristics of children who are sexually abused, especially in
light of the untainted evidence of guilt.

(Mich. Ct. App. Op., ECF No. 8-18, PageID.1314.)

Petitioner has never filled the critical gap that the Michigan Court of Appeals identified in his argument.  It is entirely possible that the transcript excerpts provided by the prosecutor satisfy the prosecutor's obligations under Mich. Ct. R. 6.201(A)(3).   Nonetheless, Petitioner never provided the documents to the Michigan appellate courts (or this court).  To simply say the documents were insufficient is not enough.  Petitioner has not shown that the prosecutor failed to comply with the Michigan Court Rule.  Therefore, any claims that Petitioner's trial was rendered fundamentally unfair by the breach, or that counsel was constitutionally ineffective for failing to object to the breach, necessarily fail as well.  The state appellate court's rejection of Petitioner's claims is neither contrary to, nor an unreasonable application of, clearly established federal law.  Accordingly, he is not entitled to relief on this claim.

### C.    Dr. Henry's testimony violated the Michigan Rules of Evidence

Finally, Petitioner argues that his trial was rendered fundamentally unfair by the admission of Dr. Henry's testimony regarding his own study of sexually abused children where the trial court never determined that the testimony was based on sufficient facts or data or the product of reliable principles and methods as required by Michigan Rule of Evidence 702.  To fully appreciate Petitioner's argument, and the state court's consideration of it, it is helpful to review the nature of Dr. Henry's testimony regarding his own study of sexually abused children. During Dr. Henry's testimony, the jurors heard the following:

Q:    Okay. In a situation where a--a child is being sexually abused, is it common
that they don't report their abuse right away?

23

A:      One of the things that is very common in child sexual abuse is that children do not report their abuse right away. *There have been many studies, one of which I did, looking at 90 kids who had been sexually abused, and the average length of time between their abuse first starting happening, meaning the sexual abuse, and disclosure was two and-a-half years.* Other studies have ranged anywhere from 11 months to three years.

There's new research about sometimes children never report and wait to adulthood, so it is a very common practice because children are afraid, they're powerless, they're afraid what's going to happen to them or their other parent.

And they also experience shame. In other words, when something like sexual abuse happens, they think somehow they've caused it and it's something that they've brought on themselves. And so there's so many factors that it's very common for them not to disclose.

(Trial Tr. I, ECF No. 8-10, PageID.528.)  The italicized language is the only reference to a study conducted by Dr. Henry and Dr. Henry references his study in the context of discussing many studies.  Dr. Henry does not tie any of his other testimony to "his" study.  Significantly, Dr. Okla agreed with the point Dr. Henry made: that it is common for sexual abuse victims to delay disclosure of the abuse—she opined "it can be years or maybe never."  (Trial Tr. II, ECF No. 8-12, PageID.914-915.)

Despite the innocuous character of the content of Dr. Henry's study, Petitioner claims it was error for the court to permit Dr. Henry's expert testimony because the court failed to fulfill its "'gatekeeper role'" under Michigan Rule of Evidence 702 to "'ensure that each aspect of an expert witness's proffered testimony—including the data underlying the expert's theories and the methodology by which the expert draws conclusions from the data—is reliable.'"  (Pet'r's Br., ECF No. 1, PageID.61 (quoting *Gilbert v. Daimler Chrysler Corp.*, 685 N.W.2d 391, 407 (Mich.

24

2004).)  Petitioner's argument raises only a state law issue.  The Michigan Court of Appeals concluded, however, that there was not error under state law:

> With respect to Henry's testimony concerning his study of 90 sexually abused children and his opinions that flowed from the study, defense counsel did not challenge Henry's testimony, and we are not prepared to rule that the trial court was obligated, in that situation and given the nature of Henry's views, to sua sponte undertake its own analysis under MRE 702 to determine whether the testimony was based on sufficient facts or data or whether the testimony was the product of reliable principles and methods.  Moreover, in the context of plain-error analysis, defendant has failed to show that there was a plain error in admitting the evidence, i.e., that it was plain and obvious that Henry's testimony regarding the study and the opinions based on the study were inadmissible under MRE 702.  *People v Carines*, 460 Mich 750, 763-764; 597 NW2d 130 (1999).  Nor has defendant shown the requisite prejudice . . . .

(Mich. Ct. App. Op., ECF No. 8-18, PageID.1314.)  Moreover, the federal courts have no power to intervene on the basis of a perceived error of state law.  *Wilson*, 562 U.S. at 5; *Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Estelle*, 502 U.S. at 67-68; *Pulley v. Harris*, 465 U.S. 37, 41 (1984).  Petitioner cites no clearly established federal law which the Michigan Court of Appeals unreasonably applied in reaching its determination or to which the Michigan Court of Appeals determination is contrary.  Accordingly, Petitioner is not entitled to habeas relief for the trial court's failure to sua sponte put a halt to Dr. Henry's testimony.

Petitioner's further contention that his trial counsel was ineffective for failing to raise the Michigan Rule of Evidence 702 issue similarly fails.  The court of appeals concluded the issue had no merit.  The Sixth Circuit has held that "'counsel cannot be ineffective for a failure to raise an issue that lacks merit.'"  *Willis v. Smith*, 351 F.3d 741, 745 (6th Cir. 2003) (quoting *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001)).  *See also Smith v. Bradshaw*, 591 F.3d 517, 523 (6th Cir. 2010).  "Omitting meritless arguments is neither professionally unreasonable nor

25

prejudicial." *Coley v. Bagley*, 706 F.3d 741, 752 (6th Cir. 2013). Moreover, the Michigan Court of Appeals concluded that foregoing the Rule 702 challenge was part and parcel of counsel's sound strategy to let Dr. Okla handle challenges to Dr. Henry's testimony. (Mich. Ct. App. Op., ECF No. 8-18, PageID.1314.) Thus, even if the admission of the evidence were erroneous under Rule 702, counsel had a valid, strategic reason to not object. The court of appeals' determination is not unreasonable on this record and is entirely consistent with, and a reasonable application of, *Strickland*. Accordingly, Petitioner is not entitled to habeas relief on this ineffective assistance of counsel issue.

### V.    Uncertainty in the Charging Documents and Verdict Form

Petitioner next raises a theme common among those convicted of repeated sexual abuse of a child. When the charges include multiple incidents of sexual misconduct and the incidents are not described with sufficient specificity as to time and place, it is difficult to prepare a defense and to ensure unanimity among the jurors as to any particular incident. When all instances of sexual contact are charged and when the jury convicts or acquits on all counts, there is no issue. Where, as here, not all instances of sexual contact are charged and the jury convicts on some counts and acquits on some counts, the words on the form do not establish that the jurors were all considering the same incident when they reached their verdict on any particular count.

At the beginning of Petitioner's trial, he was charged with 26 counts of CSC-III. Based on the preliminary examination testimony and the pretrial pleadings, Petitioner describes the factual predicates for those claims as follows:

Counts
1-4:   2 counts for sexual intercourse and 2 counts for fellatio in the yard;

5-20:  8 counts for sexual intercourse and 8 counts for fellatio in the field;

21-24: 2 counts for sexual intercourse and 2 counts for fellatio in the car; and

25-26: 1 count for sexual intercourse and 1 count for fellatio in [the victim's] house.

(Pet'r's Br., ECF No. 1, PageID.71.)  The charges were originally bound over as CSC-I counts. That information was quashed (Mot. to Quash Tr. II, ECF No. 8-4.), and the district court conducted a second preliminary examination (2nd Prelim. Exam. Tr., ECF No. 8-6)  The district court bound Petitioner over on the same 26 incidents, but the charges were now CSC-III.  (*Id*.)

After the victim testified at trial, the prosecutor reduced the number of counts to 23.  The new list of counts compares to the list above as follows: there was only one sexual encounter in the front yard, it involved a penile/vaginal penetration and a penile/oral penetration; there was only one sexual encounter in the car, it involved only a penile/oral penetration; and there were two sexual encounters in the house (on the same day), each involving a penile/vaginal penetration and a penile/oral penetration.   Therefore, the total went from 26 counts to 23 counts. The prosecutor described them in his closing argument as follows:

The first sixteen counts, I--I get from—Mikaela testified that there were eight occurrences--find it—there were eight occurrences behind this large tree--this is Exhibit Fourteen--where they had sexual relations.  You remember her testimony was they went behind the tree so that she could see her bedroom in case her mother turned the light on--to warn them that they were caught.

On all eight of those occurrences--she said between eight and ten--the reason I went with eight was because I rounded down in my charging.  She said between eight and ten times, and in each one of those occurrences there was oral and vaginal sex.  And so there's a difference between the oral and the vaginal, and so that gives you eight times two, sixteen.  So there's two counts for each one of those eight occurrences behind the tree.

Then Mikaela testified to the day that Mr. Zacharko came down in the morning when he knew her mom was at work.  They had sex, both oral and vaginal

27

sex, in the morning in the hallway of her home, and they had then went to the park-
-again, grooming, showing a relationship--then they came back and he perpetrated
on her again having oral and vaginal sex again in her living room.

Remember Mikaela explaining why he left very quickly after that, worried
that what?  Her mother might come home and catch them.

So that there is four more counts.  So we go from 16--the original 16 behind
the tree--four more counts, so there's 20.  That's the--the first 20 counts.

Count 21 is oral sex only.  Mikaela testified that there was on one occasion
Mr. Zacharko came down, the weather wasn't good, it was raining so they couldn't
go "farming" as Mr. Zacharko liked to put it.  They had to stay in the car and she
performed oral sex on him. So that's count 21.

Counts 22 and 23 are that first evening, the first time that they had sexual
intercourse in the front yard of her home behind the tree.  And again, in that
situation, she testified that there was both oral and vaginal sex.  There you have two
more counts, and that's where the 23 counts of criminal sexual conduct in the third
degree come from.

(Trial Tr. III, ECF No. 8-13, PageID.987-988.)  The prosecutor was specifically referencing the

counts as they appeared in the amended information.

The verdict form, however, did not track the amended information.  It listed 23

counts; but the first 11 were penile/vaginal penetrations and the last 12 were penile oral

penetrations.  There was nothing on the verdict form, other than the number assigned to that count,

to distinguish one penile/vaginal penetration from another or one penile/oral penetration from

another.  The court instructed the jury regarding the verdict as follows:

The Defendant is here charged with 23 counts of criminal sexual conduct in
the third degree.  These are each separate crimes, and the Prosecutor is charging
that the Defendant committed all of them.  You must consider each crime separately
in light of all the evidence in the case.  You may find the Defendant guilty of all,
or any combination of these crimes, or not guilty.

And I'm going to go through the verdict form with you, and it is as follows:

28

"The People of the State of Michigan versus James Paul Zacharko, II.  You may return only one verdict for each count.  Please mark only one box for each count on this form.

Count one, criminal sexual conduct in the third degree, penis/vagina, not guilty or guilty.

Count two, criminal sexual conduct third degree, penis/vagina, not guilty or guilty.

Count three, criminal sexual conduct third degree, penis/vagina, not guilty or guilty.

Count four, criminal sexual conduct third degree, penis/vagina, not guilty or guilty.

Count five, criminal sexual conduct third degree, penis/vagina, not guilty/guilty.

Count six, criminal sexual conduct third degree, penis/vagina, not guilty/guilty.

Count seven, criminal sexual conduct third degree, penis/vagina, not guilty/guilty.

Count eight, criminal sexual conduct third degree, penis/vagina, not guilty/guilty.

Count nine, criminal sexual conduct third degree, penis/vagina, not guilty/guilty.

Count ten, criminal sexual conduct third degree, penis/vagina, not guilty/guilty.

Count eleven, criminal sexual conduct third degree, penis/vagina, not guilty/guilty.

Count twelve, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count thirteen, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count fourteen, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count fifteen, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count sixteen, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count seventeen, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count eighteen, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count nineteen, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count twenty, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count twenty-one, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count twenty-two, criminal sexual conduct third degree, oral/penis, not guilty/guilty.

Count twenty-three, criminal sexual conduct third degree, oral/penis, not guilty/guilty. '

Now you're going to get the jury instructions to go with you. You're going to get one of these verdict forms that the foreperson will be responsible for. You have reach a unanimous verdict on each count, so you have to go count by count, and when you have a unanimous verdict you can check the box.

You have to be in agreement not only with the elements, but also that you're talking about the same occurrence. So one can't be thinking of one time and one can't be thinking of another. You all have to be talking about the same incident and then be unanimous in your decision on that as to guilt or not guilty. Do you all understand that? Okay.

(Trial Tr. III, ECF No. 8-13, PageID.1038-1043.)  Petitioner argues that the information and the verdict form were insufficient.  He contends he did not receive sufficient notice of the charges and that his right to hold the prosecutor to the burden of proof on all counts was violated.

The Michigan Court of Appeals did not expressly address Petitioner's argument regarding the defect in notice of the charges.  Certainly, Petitioner has provided the argument greater emphasis in this Court; but, it was raised in Petitioner's appellate briefs and rejected by the court of appeals, at least implicitly.  As noted above, where the state court does not provide an articulated analysis of the constitutional issue, this Court must still apply AEDPA deference; the deference, however, is to the result reached, not the reasoning used.  *Hawkins*, 547 F.3d at 546-47.

The Due Process Clause of the Fourteenth Amendment mandates that whatever charging method the state employs must give the criminal defendant fair notice of the charges against him so as to provide him an adequate opportunity to prepare his defense. *See*, *e.g.*, *In re Ruffalo*, 390 U.S. 544 (1968); *Blake v. Morford*, 563 F.2d 248 (6th Cir. 1977); *Watson v. Jago*, 558 F.2d 330, 338 (6th Cir. 1977).  This requires that the offense be described with some precision and certainty so as to apprise the accused of the crime with which he stands charged. *Combs v. Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976).  Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial. *Id*.  "Beyond notice, a claimed deficiency in a state criminal indictment is not cognizable on federal collateral review."  *Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (quoting *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir. 1986)).  "An indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable in habeas proceedings." *Mira*, 806 F.2d at 639.  In other words, as long as "sufficient notice of the charges is given in some . . . manner"

31

so that the accused may adequately prepare a defense, the Fourteenth Amendment's Due Process

Clause is satisfied.  *Koontz v. Glossa*, 731 F.2d 365, 369 (6th Cir. 1984); *Watson*, 558 F.2d at 338.

As noted above, Petitioner's argument is commonly raised by persons accused of

serial sexual abuse of a child.   It was raised, for example, in *Valentine v. Konteh*, 395 F.3d 626

(6th Cir. 2005).  The *Valentine* court described the factual background of that case as follows:

> An Ohio jury convicted Michael Valentine of 40 counts of sexual abuse, for which he was sentenced to 40 consecutive life sentences. In bringing a petition for habeas corpus, he contends that the Ohio indictment violated his constitutional right to due process. Valentine was convicted of 20 "carbon-copy" counts of child rape, each of which was identically worded so that there was no differentiation among the charges and 20 counts of felonious sexual penetration, each of which was also identically worded. The prosecution did not distinguish the factual bases of these charges in the indictment, in the bill of particulars, or even at trial. The only evidence as to the number of offenses was provided by the testimony of the child victim, who described typical abuse scenarios and estimated the number of times the abusive offenses occurred, e.g., "about 20," "about 15" or "about 10" times. The District Court issued the writ of habeas corpus with respect to all counts on the ground that the indictment and conviction violated Valentine's federal due process rights to notice of the crime charged with sufficient specificity so that he would not again be put in jeopardy of the same crime.

*Id.* at 628.  Valentine challenged two aspects of insufficient notice with regard to his indictment:

"(1) the wide date range and (2) the lack of differentiation among the criminal charges."  *Id.* at

632.  The Sixth Circuit rejected the challenge with regard to the lack of specificity with regard to

dates.  *Id.*  The court, however, upheld the writ on notice grounds because of the prosecutor's

failure to anchor the forty criminal counts to forty distinguishable offenses.  Because the failure

was not corrected before or during trial, the *Valentine* court reasoned, the lack of sufficient notice

in the indictment violated Valentine's due process rights.  *Id.* at 634.

32

The charging document challenged by Petitioner here is very different than the indictment at issue in *Valentine*.  The charges are specific as to the act alleged (penile/vaginal or penile/oral penetration).  Moreover, the charges span just a few months.  Most significantly, however, at trial the victim's testimony served to differentiate the charges, to an extent, as to location and timing.  The prosecutor amended the information accordingly.  It is possible to identify a sufficient number of specific acts of penetration to correspond to the jury's findings of guilt.

Further, even if *Valentine* were not distinguishable, it would not entitle Petitioner to relief.  In *Coles v. Smith*, 577 F. App'x 502 (6th Cir. 2014), the Sixth Circuit considered and rejected the type of argument Petitioner raises here.  Joseph Coles was charged with "forty-three undifferentiated counts of rape" of his stepdaughter.  *Coles v. Smith*, No. 1:10CV525, 2013 WL 474706 *1 (N.D. Ohio, Feb. 7, 2013).  The victim's testimony at trial disclosed dozens more incidents of rape over the charged period.  *Id.* at *7.  The Sixth Circuit recognized that the indictment in Coles' case was similar to the indictment it concluded was improper in *Valentine*.  *Coles*, 577 F. App'x at 507.  Nonetheless, the court refused to follow *Valentine* and grant habeas relief.  The court explained:

> The *Valentine* court based its legal reasoning on Supreme Court cases applicable to federal indictments, *Russell*, 369 U.S. at 763–64; *Hamling*, 418 U.S. at 117–18, and a few circuit cases, including *Isaac v. Grider*, 211 F.3d 1269, 2000 WL 571959, at *4 (6th Cir. 2000), *DeVonish v. Keane*, 19 F.3d 107, 108 (2d Cir. 1994), *Fawcett v. Bablitch*, 962 F.2d 617, 618–19 (7th Cir.1992), and *Parks v. Hargett*, 188 F.3d 519, 1999 WL 157431, at *3 (10th Cir. 1999). Two of those cases, *DeVonish* and *Fawcett*, were decided before AEDPA was enacted in 1996, while *Isaac* and *Parks*—and *Valentine* itself—were decided before the Supreme Court issued *Renico* in 2010.  In light of *Renico*'s admonition that "clearly

33

established Federal law" means relevant Supreme Court precedent and not circuit court opinions, *see Renico*, 559 U.S. at 778–79, and because "no Supreme Court case has ever found the use of identically worded and factually indistinguishable [state] indictments unconstitutional," *Valentine*, 395 F.3d at 639 (Gilman, J., dissenting), we doubt our authority to rely on our own prior decision—*Valentine*—to "independently authorize habeas relief under AEDPA." *Renico*, 559 U.S. at 779. Rather, Coles must point to a Supreme Court case that would mandate habeas relief in his favor. He has not done so, and consequently, he has not demonstrated that the decision of the Ohio Court of Appeals rejecting his Sixth Amendment claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States." 28 U.S.C. § 2254(d)(1); *Renico*, 559 U.S. at 779.

*Coles*, 577 F. App'x at 507-08 (parallel citations omitted). Put simply, neither *Valentine* nor the cases cited therein are clearly established Supreme Court precedent. They cannot be relied upon to authorize habeas relief.

Petitioner has failed to establish that the Michigan Court of Appeals' implicit rejection of Petitioner's challenge to the constitutional sufficiency of the notice provided by the charges is contrary to or an unreasonable application of clearly established federal law. Accordingly, his habeas challenge to sufficient notice is without merit.

The same result follows with respect to Petitioner's argument that the prosecutor was not held to his burden of proof. The Michigan Court of Appeals directly addressed that issue:

Defendant correctly observes that he was entitled to a unanimous jury verdict and that the trial court was obligated to so instruct the jury. MCR 6.410(B); *People v Cooks*, 446 Mich 503, 510-511; 521 NW2d 275 (1994). "[W]here materially identical evidence is presented with respect to each act, and there is no juror confusion, a general unanimity instruction will suffice." *Cooks*, 446 Mich at 512-513. Here, after reciting the language in the verdict form to the jury as to all 23 counts, the trial court then directed the jury as follows:

Now you're going to get the jury instructions to go with you. You're going to get one of these verdict forms that the foreperson will be responsible for. You have [to] reach a unanimous verdict on each count, so you have to go count by count, and when you have a unanimous verdict you can check the box.

You have to be in agreement not only with the elements, but also that you're talking about the same occurrence. So one can't be thinking of one time and one can't be thinking of another. You all have to be talking about the same incident and then be unanimous in your decision on that as to guilt or not guilty. Do you all understand that? Okay.  [Emphasis added.]

Jurors are presumed to follow their instructions.  *People v Mahone*, 294 Mich App 208, 212; 816 NW2d 436 (2011).

Although each count in the verdict form did not identify, beyond indicating the type of sex act alleged, the specifics of the sex act, such as when and where it took place, the jurors, in light of the court's instruction, were fully aware of the fact that they had to be unanimous and be discussing the same incident, whether it was oral sex in the field on one day or intercourse in the house on another day, when addressing each individual count.  Indeed, the quoted jury instruction went beyond a mere general unanimity instruction; it was specific.  We cannot envision any juror confusion under the circumstances; therefore, the trial court did not err and counsel's performance was not deficient in relation to the verdict form.

(Mich. Ct. App. Op., ECF No. 8-18, PageID.1315.)

Petitioner focuses on the requirement of jury unanimity in presenting this argument. That is not a federal constitutional issue.  As the Supreme Court stated in *McDonald v. City of Chicago*, 561 U.S. 742 (2010), "[t]he Court has held that although the Sixth Amendment right to trial by jury requires a unanimous jury verdict in federal criminal trials, it does not require a unanimous jury verdict in state criminal trials."  *Id*. at 766 n.14 (citing *Apodaca v. Oregon*, 406 U.S. 404 (1972) and *Johnson v. Louisiana*, 406 U.S. 356 (1972)).  The Michigan Court of Appeals determination that the state requirement of unanimity was satisfied in Petitioner's case, conclusively resolves the issues.  The Sixth Circuit repeatedly has recognized "'that a state court's interpretation of state law, including one announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas corpus.'"  *Stumpf v. Robinson*, 722 F.3d 739, 746 n.6 (6th

Cir. 2013) (quoting *Bradshaw*, 546 U.S. at 76).   Moreover, counsel's failure to challenge the

verdict form on unanimity grounds would have been meritless; thus, that failure cannot serve as

the foundation for an ineffective assistance of counsel claim.   In short, Petitioner has failed to

demonstrate that the state appellate court's determination of this issue was contrary to, or an

unreasonable application of, clearly established federal law.   Therefore, he is not entitled to habeas

relief.

VI.    Michigan State Police Lab Report and Analyst Testimony

The Michigan Court of Appeals summarized the controversy surrounding the lab

report as follows:

> Defendant finally argues that trial counsel was ineffective for failing to
> obtain a fingerprint report and for failing to call the lab analyst as a witness to admit
> the fingerprint report as evidence.   The report concerned a bag with a phone that
> was recovered near the victim's house.   The victim had testified that defendant had
> been providing her with prepaid cell phones so that they could continue to
> communicate after her mother had told defendant to stop communicating with the
> victim.   There is no dispute that the report existed and established that defendant's
> fingerprints were not on the bag or phone.   And there was testimony that the
> materials had been sent to a state police lab for testing, but the jury never heard any
> evidence of the actual results.   Defense counsel had attempted to introduce the
> fingerprint results through the testimony of the investigating officer, as opposed to
> a lab analyst, and the trial court rebuked counsel's effort.   Defense counsel then
> employed the strategy of simply indicating to the jury that, given the failure by the
> prosecution to show that defendant's fingerprints were actually on the bag or phone,
> the jury could infer that there were no such prints.

(Mich. Ct. App. Op., ECF No. 8-18, PageID.1317.)   The report was made available to the court of

appeals.   Petitioner has also attached it to his petition as exhibit 1.   (Lab Report, ECF No. 1-2,

PageID.99-100.)   The items sent to the lab were a red cellphone and a black phone charger

swaddled within layers of plastic bags.   (*Id*.)   Only the phone charger had fingerprints of

comparison value.   (*Id*.)   The prints did not match Petitioner's.   (*Id*.)   The report does not indicate

whether the fingerprints were compared to the fingerprints of the victim's mother who opened the bag and looked at its contents.  (Trial Tr. I, ECF No. 8-10, PageID.477.)

Counsel testified at the *Ginther* hearing that he wanted to introduce the results of the report, but, if that were not possible, that he considered the next best option to be reliance upon the negative implication that followed from the fact of testing and the prosecutor's failure to present the result.  The trial court found that persuasive, the court of appeals did not:

> In denying defendant's claim of ineffective assistance of counsel on this issue, the trial court determined that trial counsel was aware of the report and its contents and that counsel had made a strategic decision not to delve into the matter. We question the soundness of this reasoning.

(Mich. Ct. App. Op., ECF No. 8-18, PageID.1317.)  The court of appeals judges had more faith in the exonerating power of the lab analyst's testimony than did the trial court.  Perhaps the trial court had heard the testimony of more lab analysts regarding the significance of the absence of fingerprints.  This Court's deference, however, is owed to the court of appeals' determination. That court resolved the matter as follows:

> [A]ssuming deficient performance by counsel, defendant simply cannot establish the requisite prejudice.  The issue was collateral, the lack of defendant's fingerprints on the materials was of minimal evidentiary value in the context of all the other circumstances in the case, and the jury ultimately entered into deliberations with the knowledge that the prosecution did not submit any evidence showing defendant's prints on the materials despite the testing.  Reversal is unwarranted.

(*Id*., PageID.1317-1318.)  The appellate court's factual findings are well-supported by the record. Moreover, Petitioner has failed to show that the appellate court's determination that there was no prejudice is contrary to, or an unreasonable application of, *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this issue.

VII.    Prior Bad Acts

The prosecution introduced into evidence an email from Petitioner to the victim's mother and texts from Petitioner to the victim.  Those communications had the effect of informing the jury that Petitioner had spent "a few days in jail," had his "hands covered in filthy female pot plant," had previously gotten "high," and had "too much of a record to ever get hired again" if he lost his job.  (Pet'r's Br., ECF No. 1, PageID.86.)  Petitioner contends the admission of this information violated Michigan Rule of Evidence 404(b) regarding other bad acts and was so prejudicial that it violated his right to due process and rendered his trial fundamentally unfair. Moreover, Petitioner contends that his counsel's failure to object to the evidence or insist on redaction of the prejudicial parts of the texts and email constituted ineffective assistance.

Petitioner's first contention—that the introduction of "other bad acts" evidence violates due process—is not consistent with clearly established federal law.   There is no clearly established Supreme Court precedent that holds that a state court violates the Due Process Clause by permitting propensity evidence in the form of other bad acts evidence.  In *Estelle v. McGuire*, the Supreme Court declined to hold that the admission of prior acts evidence violated due process. *Estelle*, 502 U.S. at 75. The Court stated in a footnote that, because it need not reach the issue, it expressed no opinion as to whether a state law would violate due process if it permitted the use of prior crimes evidence to show propensity to commit a charged crime.  *Id.* at 75 n.5.  While the Supreme Court has addressed whether prior acts testimony is permissible under the Federal Rules of Evidence, *see Old Chief v. United States*, 519 U.S. 172 (1997); *Huddleston v. United States*, 485 U.S. 681 (1988), it has not explicitly addressed the issue in constitutional terms.  The Sixth Circuit has found that "[t]here is no clearly established Supreme Court precedent which holds that a state violates due process by permitting propensity evidence in the form of other bad acts

evidence." *Bugh*, 329 F.3d at 512.  The state court's result implicitly rejecting Petitioner's due process claim is, therefore, neither contrary to, nor an unreasonable application of, clearly established federal law.

Petitioner's second contention—that counsel rendered ineffective assistance because he failed to object to the evidence or insist upon redaction—also fails.  The Michigan Court of Appeals determined that the evidence was properly admitted under the Michigan Rules of Evidence.  (Mich. Ct. App. Op., ECF No. 8-18, PageID.1316-1317.)  That determination binds this Court.  *Stumpf*, 722 F.3d at 746 n.6 (quoting *Bradshaw*, 546 U.S. at 76).  It also establishes the foundation for the appellate court's further conclusion that any objection would have been futile.  (Mich. Ct. App. Op., ECF No. 8-18, PageID.1317.)  That determination forecloses Petitioner's ineffective assistance claim and is neither contrary to, nor an unreasonable application of, *Strickland*.  Accordingly, Petitioner is not entitled to habeas relief on this claim.

### Certificate of Appealability

Unless a certificate of appealability is issued, an appeal of the denial of a habeas corpus petition may not be taken.  28 U.S.C. § 2253(c)(1).  A certificate should issue if Petitioner has demonstrated a "substantial showing of a denial of a constitutional right."  28 U.S.C. § 2253(c)(2).  The Sixth Circuit Court of Appeals has disapproved issuance of blanket denials of a certificate of appealability.  *Murphy v. Ohio*, 263 F.3d 466 (6th Cir. 2001).  Rather, the district court must "engage in a reasoned assessment of each claim" to determine whether a certificate is warranted.  *Id.* at 467.

I have examined each of Petitioner's claims under the standards set forth by the Supreme Court in *Slack v. McDaniel*, 529 U.S. 473 (2000).  Under *Slack*, to warrant a grant of the certificate, "[t]he petitioner must demonstrate that reasonable jurists would find the district court's

assessment of the constitutional claims debatable or wrong." *Id.* "A petitioner satisfies this standard by demonstrating that . . . jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 327 (2003). In applying this standard, the Court may not conduct a full merits review, but must limit its examination to a threshold inquiry into the underlying merit of Petitioner's claims. *Id.*

I find that reasonable jurists would not conclude that this Court's denial of Petitioner's claims is debatable or wrong.

## Recommended Disposition

For the foregoing reasons, I respectfully recommend that the habeas corpus petition be denied. I further recommend that a certificate of appealability be denied. *See Slack v. McDaniel*, 529 U.S. 473 (2000).


Dated:  May 10, 2018                              /s/ Ray Kent
                                                  United States Magistrate Judge



## NOTICE TO PARTIES

Any objections to this Report and Recommendation must be filed and served within 14 days of service of this notice on you.  28 U.S.C. § 636(b)(1)(c); Fed. R. Civ. P. 72(b).  All objections and responses to objections are governed by W.D. Mich. LCivR 72.3(b).  Failure to file timely objections may constitute a waiver of any further right of appeal. *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981); *see Thomas v. Arn*, 474 U.S. 140 (1985).